IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Centex Homes, a Nevada General Partnership, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) Civil Action No. 4:08-cv-2495-TLW ) |
| South Carolina State Plastering, LLC, Carolina Drywall & Interior, Inc., Ferst Plastering, Inc., | ) ) ) ) |
| Defendants. | ) ) ) |

# ORDER

This action was filed in this Court on July 10, 2008. (Doc. #1). An amended complaint was filed on August 6, 2008. (Doc. #15). Defendant South Carolina State Plastering, LLC ("SCSP") filed a motion for summary judgment on September 18, 2009. (Doc. #76). The plaintiff, Centex Homes ("Centex"), filed a response in opposition on October 16, 2009. (Doc. #90). SCSP filed a reply on October 26, 2009. (Doc. #97).

Defendant Ferst Plastering, Inc. ("Ferst Plastering") filed a motion for summary judgment on September 28, 2009. (Doc. #80). Centex filed a response in opposition to this motion on October 16, 2009. (Doc. #92). Ferst filed a reply on October 29, 2009. (Doc. #98).

Defendant Carolina Drywall & Interior, Inc. ("Carolina Drywall") filed a motion for summary judgment on October 2, 2009. (Doc. #85). Centex filed a response in opposition on October 19, 2009. (Doc. #94). Carolina Drywall filed a reply on November 10, 2009. (Doc. #104).

This Court held a joint hearing on the parties' motions for summary judgment on May 26, 2010. This Court has considered the motions, memoranda, and arguments of the parties, and this matter is now ready for disposition.

## FACTS

Plaintiff Centex was the developer, general contractor, and seller of a condominium complex located in North Myrtle Beach, South Carolina. The condominium complex, known as Edgewater, consists of ten four-story buildings. Each building contains approximately twenty-four individual condominium units. The action now before this Court concerns two buildings within the condominium complex. Specifically, this action involves Building 3 which was completed on June 20, 2001; and Building 1 which was completed on April 29, 2002. Building 3 was the first building to be completed within the Edgewater development, and Building 1 was the second building to be completed.

The defendants in this action are construction subcontractors hired by Centex to participate in the construction of the buildings at issue in this case. Defendant Ferst Plastering applied the stucco finish on Building 3, the first building within the sequence of construction. Defendant SCSP applied the stucco finish on Building 1. Defendant Carolina Drywall installed waterproofing, drip edges, and cant strips (metal strips with a 90 degree angle installed at intersections between a roof and a wall) on both Building 3 and Building 1.

In 2002, Centex discovered water damage to Building 3. The damage was thought to have been caused by water intrusion at the intersection between the decks and the outside walls of the condominium units. Defendants Ferst Plastering and Carolina Drywall each participated in extensive repairs that were performed in 2002 to address this damage. The record indicates that part of this

2

remedial work included the installation of "kickout" flashing at the intersections between the decks and the walls of the building. The purpose of this flashing was to divert water away from this deck-wall intersection and towards the outer face of the building to prevent water accumulation and intrusion at the deck-wall intersections. The record further indicates that this flashing was not included in the original blueprints for the buildings. Because SCSP had not worked on Building 3, SCSP did not participate in the 2002 remediation to that building. No damage to Building 1 was discovered in 2002.

In 2006, Centex discovered the presence of water damage in both Building 3 and Building 1. Again, the damage was thought to have been caused, at least in part, by water intrusion at the intersection between the decks and the outside walls of the condominium units. Between 2006 and 2007, Centex asserts that it spent in excess of $1 million to repair this damage. Centex filed the instant action against numerous construction subcontractors who participated in the construction of Building 3 and Building 1, alleging claims for negligence, breach of warranty, indemnity, and breach of contract. (Am. Compl., Doc. #15).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the defendants are entitled to summary judgment if the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As the party seeking summary judgment, the defendants bear the initial responsibility of informing this Court of the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This

requires that the defendants identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which they believe demonstrate the absence of genuine issues of material fact. Celotex, 477 U.S. at 323; see also Anderson, 477 U.S. at 249.

Though the defendants bear this initial responsibility, the plaintiff, as the nonmoving party, must then produce "specific facts showing a genuine issue for trial." Fed R. Civ. P. 56(e)(2); see Celotex, 477 U.S. at 317. In satisfying this burden, the plaintiff must offer more than a mere "scintilla of evidence" that a genuine issue of material fact exists, Anderson, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the plaintiff must produce evidence on which a jury could reasonably find in its favor. See Anderson, 477 U.S. at 252.

In considering the defendants' motions for summary judgment, this Court construes all facts and reasonable inferences in the light most favorable to the plaintiff as the nonmoving party. See Miltier v. Beorn, 869 F.2d 848 (4th Cir. 1990). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotations omitted).

## DISCUSSION

The basis of each individual defendants' motion for summary judgment is that the action is barred by statute of limitations. Pursuant to South Carolina law, the statute of limitations applicable to the instant case is three years. S.C. Code Ann. § 15-3-530. Under the discovery rule, the statute of limitations begins to run from the date the injured party either knows or should know, by the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct. Epstein v.

4

Brown, 610 S.E.2d 816, 818 (2005); Dean v. Ruscon Corp., 468 S.E.2d 645, 647 (1996). The South Carolina Supreme Court has further explained that the exercise of reasonable diligence "means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some claim against another party **might** exist." Epstein, 610 S.E.2d at 818 (emphasis in original). The court added that "**[t]he statute of limitations begins to run from this point and not when advice of counsel is sought or a full-blown theory of recovery developed**." Id. (emphasis in original). The court has also noted that "the fact that the injured party may not comprehend the full extent of the damage is immaterial." Dean, 468 S.E.2d at 647 (citing Dillon Cty. Sch. Dist. No. Two v. Lewis Sheet Metal Works, Inc., 332 S.E.2d 555 (Ct. App. 1985)). The South Carolina Court of Appeals has further held that "[t]he date on which discovery of the cause of action should have been made is an objective, rather than a subjective, question," and that "[i]n other words, whether the particular plaintiff actually knew he had a claim is not the test." Rumpf v. Mass. Mut. Life Ins. Co., 593 S.E.2d 183, 187 (Ct. App. 2004) (internal citations omitted).

### a. South Carolina State Plastering

In its motion, SCSP notes that it applied the stucco finish on Building 1, a building for which the certificate of occupancy was issued on April 29, 2002. Centex did not discover water intrusion damage to this building until 2006. SCSP asserts that Centex knew or should have known, by the exercise of reasonable diligence, that a cause of action existed with regard to Building 1 in the summer of 2002. SCSP's argument is based on the fact that similar problems developed in Building 3, a nearly identical building constructed next door to Building 1, only months after Building 1 was completed in 2002.

5

Much of the damage that occurred on Building 3 was traced to water intrusion at the intersection between the decks and the outside walls of the condominium units. To address this problem, Centex had kickout flashing installed at these intersections to help channel water away from these intersections towards the outer walls of the structure. The record indicates that the installation of this kickout flashing was one of the primary steps that was taken to prevent further damage to Building 3. A Centex field manager highlighted the importance of this design detail when discussing changes that were incorporated into the construction process for the third building to be completed within the complex, Building 2, testifying that:

> Q . . . Do you recall there being any discussion within Centex about there being problems with water intrusion in Building 3 and Building 1 to the extent that Building 2 was being constructed slightly differently or with those problems in mind?
> A Yes, Sir.
> Q Tell me about that if you would, please.
> A Well, you know, Building 3, we - - we learned from Building 3 what not to do, practices on Building 2. And then what, you know, what we - - what we could improve on as a company to go forward on.
> Q With respect to elements of the stucco application, tell me about that learning curve between Building 3 and Building 2.
> A That was the - - learning curve was the flashing detail.
> Q And flashing where?
> A Around the - - the deck areas, kickouts.
> Q Okay. And the original construction of Building 3 as I understand it, there was no flashing detail in the documents; is that correct?
> A There was no flashing details in the blueprints. That's correct.
> Q Blueprints, right. That is what I meant.
> A That's correct.
> Q And there were no kickouts put in around the deck columns; is that right?
> A On the construction of Building 3, that's correct.
> Q Right. And that was the essence of the remediation - - the first remediation of Building 3 was to put kickouts in?
> A That's correct.
>
> Deposition of Mark Lewis Hilts at pp. 25:3-26:13.

Thus, it appears that Centex was aware of the necessity of incorporating this kickout flashing into the design of the buildings at the time of the 2002 remediation efforts to Building 3. The record indicates that Centex went to considerable lengths to retrofit Building 3 with this kickout flashing, a process which involved removing and re-applying the stucco finish around the decks, columns, and portions of the outside walls of the building. The above-cited testimony also indicates that Centex took steps to add this kickout flashing to the buildings that were constructed in later phases of the Edgewater project. However, no steps were taken to ensure that this flashing was in place on Building 1, which had only recently been completed at the time that the 2002 remediation work was performed on Building 3. The Centex construction manager on the project testified as follows:

> Q  Did you know how it should be flashed?
> A  At the time Building 1 was built, no.
> Q  But you did gain that knowledge shortly after it was finished, correct?
> A  That's correct.
> Q  And after obtaining that knowledge, Centex did not go back and do any - - take any corrective measures to install flashing where it had been omitted, correct?
> A  Correct.
>
> Deposition of Billy Ray Martin at pp. 83:22-84:6.

The Centex field manager on the project testified that:

> Q  . . . How about on Edgewater 1? Do you know if kickouts were put on Edgewater 1 original construction?
> A  No, sir, they were not.
> Q  They were not? Do you know if at that time of the first remediation there was any discussion of going back to Edgewater 1 and putting the kickouts in?
> A  Yes, sir.
> Q  What was the decision made as to why - - Well, let me ask you: Did anyone do that?
> A  No, sir.
> Q  And why was the decision made not to do that at that point?
> A  I can't answer that question.
> Q  Well, you said it was discussed. Was the discussion with Bill Martin?
> A  Yes, Sir.

> Q Who else at Centex discussed whether at that point of the first remediation to go to Edgewater 1 and put in kickouts?
> A I did.
>   . . .
> Q Okay. You were not directed by Bill Martin to do anything regarding the kickouts on Edgewater 1, correct?
> A That's correct.
> Q And to your knowledge, no one else at Centex took the effort to do any remediation of Edgewater 1 and put kickouts in?
> A That's correct.

Deposition of Mark Lewis Hilts at pp. 90:17-92:17.

The above-cited portions of the record indicate that Centex may very well have been on notice about the need to retrofit Building 1 with kickout flashing at the deck-wall intersections in 2002. Centex argues, however, that a question of material fact exists as to whether Centex reasonably should have known that Building 1 required kickout flashing. In support of this position, Centex cites the case of Santee Portland Cement Co. v. Daniel Int'l Corp., 384 S.E.2d 693 (1989). In Santee, the plaintiff had a cement storage complex installed in 1965 that included twelve concrete silos and three bins. Id. at 693. In 1969, a small crack was discovered in one of the bins which was repaired at a relatively minimal cost. Id. Another crack appeared in the same bin in 1975. Id. at 694. The complex was inspected at this point, and the bin was again repaired at a relatively small cost. Id. However, a second storage bin collapsed in 1980 killing two individuals. Id. A subsequent investigation revealed that the bin, as well as the twelve silos, were structurally unsound because steel reinforcement rods had been improperly spaced and tied together. Id.

Following the collapse, the plaintiff brought suit against the general contractor responsible for the construction of the cement plant. The trial court concluded that the plaintiff knew or should have known that it had a cause of action against the contractor when the first crack appeared in 1969,

or at least when the second crack appeared in 1975. Id. at 695. The South Carolina Supreme Court rejected this conclusion, noting that the plaintiff had introduced expert testimony that the defects in the silos were latent. Id. at 696. There was evidence that the 1975 repairs were performed by subcontractors who had assisted in the original construction of the project, and that these subcontractors characterized the repairs as permanent. Id. The subcontractors also inspected the remaining silos at the time of these repairs, and found them to be in good condition. Id. Further, evidence in the record indicated that the silos were inspected visually by employees and periodically checked by the Mine Safety and Health Administration. Id. The South Carolina Supreme Court concluded that the evidence introduced "went to the reasonableness of [the plaintiff's] actions, which was an issue to be decided by the jury." Id. (citing Brown v. Finger, 124 S.E.2d 781 (1962)).

Centex argues that the record in this case contains similar questions of material fact with regard to the statute of limitations that must be resolved by a jury. As an initial matter, Centex argues that the lack of proper flashing beneath the stucco surface at the deck-wall intersections is a latent defect because the intersection is covered by both the deck surface and by stucco. The presence or absence of kickout flashing at these intersections is not a latent condition, as kickout flashing, which extends beyond the outer walls of the building, is visible. See (Dep. Martin at pp. 85:12-86:6). However, Centex notes that its consultant who was present during the construction of Building 1 testified that there could potentially be "more than one way" to install flashing at that location.[1] Centex interprets this statement to mean that it could reasonably assume that proper and

---

[1] See Deposition of Herschel L. Morningstar, Jr. at pp. 158:18-159:12:
Q Okay. Do you think that in 2000 and 2001, not having kickout flashings at the deck columns was a deficiency?
A I can't recall.
Q Well, as we sit here today, do you think that in 2000 and 2001, not having kickout flashings at the deck columns was a deficiency?
A I could see where they'd be a problem. I'm sure there's more than one way to do it.

effective flashing was installed beneath the stucco surface at this intersection. Regardless of whether Centex was justified in assuming this fact, the record does indicate that Centex hired an outside consultant, Herschel Morningstar, Jr., who performed onsite evaluations of the work performed on the Edgewater buildings. The record indicates that Morningstar did not discover any defects with the flashing at the time Building 1 was being constructed. This arguably creates an issue of fact as to the discovery of the alleged defect.

The record further indicates that Centex hired an additional third-party inspector to investigate potential damage to both Building 3 and Building 1 in 2002. (Aff. Martin at ¶ 15). The record indicates that this outside consultant, Manco Company, performed water penetration tests which indicated that there was no moisture damage present in Building 1 in 2002. SCSP argues that the Manco test results are irrelevant, in that the tests merely indicated that there was no moisture damage to the building at that point in time, and not that the building was free from construction defects. SCSP asserts that, regardless of the negative water penetration test results, the damage that was uncovered in the nearly identical building that was constructed next door – Building 3 – should have put Centex on notice that there was a flaw in the construction of Building 1. However, Centex notes that "[b]ased upon the combination of the 2002 Manco penetration tests results, the flashing inspections by Morningstar, the installation by stucco application expert SCSP, and reinstallation

---

Q Okay. That did not occur to you when you were making these inspections in 2001?
A No.
Q Okay. Why not?
A I suppose I was satisfied with the application of the cant strips and the flashings and counterflashings involved that it was comforting.
Q Okay. In your mind, all of that conformed with the plans and specs, to the extent that there were plans and specs for that detail?
A Yes.

of stucco finish coat supervised by Sonneborne manufacturing representatives,[2] Centex did not believe the condition of Building 1 warranted corrective action in 2002." (Martin Aff. at ¶ 15). These facts are sufficient to create an issue of fact as to the discovery of the allegedly defective workmanship.

The Court also notes that the record does not conclusively establish that the water intrusion damage to Building 1 can be attributed, in total, to the lack of kickout flashing on the building. The record does suggest that it may be accurate to attribute the damage to Building 1 to the lack of kickout flashing.[3] However, the record also indicates that Building 3 suffered additional damage that was discovered in 2006 despite the fact that the building had been retrofitted with kickout flashing in 2002. The record further indicates that the scope of the 2002 remediation work performed on Building 3 was more extensive than the installation of kickout flashing, a fact that suggests that the installation of this flashing was not seen as the ultimate solution to the water intrusion problem in Building 3. While the Centex construction manager on the project appears to concede that the damage to Building 1 can be traced to a defect in the original construction of the building, the construction manager does not concede that the damage can be traced solely to the lack of kickout

---

[2]The record indicates that the finish coat applied to the stucco on Building 1 initially peeled off, and that the finish coat was reapplied by SCSP under the supervision of the stucco manufacturer. However, the record appears to indicate that this problem was traced to a product failure that was remedied by the finish coat manufacturer. It does not appear to the Court that this problem with the finish coat was causally connected to the water damage at issue in this case.

[3]See Deposition of Billy Ray Martin at p. 81:14-17:
Q Other than that flashing detail at the deck, are you aware of any other error or omission by South Carolina State plastering?
A No.

flashing on the building.[4]  Thus, the record before the Court does not conclusively establish that the damage at issue in this case can be traced, at least in full, to the lack of kickout flashing.  A conclusion that Centex is barred from bringing an action to recover for the water intrusion damage that was discovered in 2006 because it did not take steps to insure that kickout flashing was properly installed in 2002 requires this Court to infer that the damage would be prevented if the kickout flashing had been properly installed.  Based on the conflicting record before the Court, such an inference must properly be made by the finder-of-fact.

Though the question is close, the Court concludes that the record in this case contains questions of material fact regarding when Centex should have known, through the exercise of reasonable diligence, that a cause of action existed against SCSP for the alleged construction defects associated with Building 1.  Viewing the evidence of record in the light most favorable to the non-moving party, the Court is constrained to deny SCSP's motion for summary judgment.  For this reason, SCSP's motion for summary judgment is denied.

**b.  Carolina Drywall**

The analysis with regard to Carolina Drywall's motion centers around the question of when Centex, through the exercise of reasonable diligence, knew or should have know that it had a claim against Carolina Drywall with regard to both Building 1 and Building 3.  Again, the record reflects

---

[4]See Deposition of Billy Ray Martin at pp. 84:16-85:6:
Q . . . the water, according to what you have said, came in as a result of something that would have occurred in the original construction, correct?
A Yes.
Q So had the repairs been made to the flashing immediately after construction was finished in the summer of 2002, the water damage could have been avoided.
A Not necessarily.
Q Would you agree that it would be significantly less?
A Possibly.
Q Did all of this water damage occur between April 29th, 2002 and the summer of 2002?
A I don't know.  I doubt that.

that Carolina Drywall was responsible for the installation of waterproofing, drip edges, and cant strips on both Building 3 and Building 1. Following the discovery of water damage to Building 3 in 2002, Carolina Drywall participated in the remedial repairs to that building. Carolina Drywall asserts that the statute of limitations should be evaluated separately as it relates to the scope of its work on Building 3 and Building 1.

With regard to Building 3, the Court concludes that Centex is not barred from bringing an action against Carolina Drywall for alleged deficiencies in workmanship. Building 3 was completed on June 20, 2001. By the summer of 2002, the building had begun showing signs of water damage. To remedy this situation, Centex had Carolina Drywall participate in the 2002 repairs. Carolina Drywall has not presented sufficient evidence to suggest that Centex should reasonably have been on notice that it had a cause of action against Carolina Drywall with respect to these repairs prior to 2006. The record does not indicate that Centex had reason to believe that the water damage would reoccur after the remediation work was performed in 2002. Because the record does not establish that Centex had reason to believe that the water damage would reoccur prior to 2006, the Court does not conclude that this action, filed in 2008, is untimely.

The Court further notes that the record is unclear as to whether the alleged defects in workmanship are related to the original construction or to the 2002 repairs. However, even if the alleged defects in workmanship relate back to the date of original construction, the Court cannot conclude that Centex's action with regard to Building 3 is time-barred. In <u>Dillon Cty. Sch. Dist. v. Lewis Sheet Metal Works, Inc.</u>, 332 S.E.2d 555, 561 (Ct. App. 1985), the South Carolina Court of Appeals noted that "[a] defendant will be estopped to assert the statute of limitations in bar of a plaintiff's claim when the delay that otherwise would give operation to the statute has been induced

13

by the defendant's conduct." The court noted that the "conduct may involve either inducing the plaintiff to believe that an amicable adjustment of the claim will be made without suit or inducing the plaintiff in some other way to forbear exercising his right to sue." Id. (citing 53 C.J.S. Limitations of Actions § 25 at 966 (1948)). The Court added that the "question of whether a defendant's conduct lulled a plaintiff into a false sense of security and thereby prevented the plaintiff from filing suit within the statutory period is ordinarily one of fact for a jury to determine." Id. (citing Lovell v. C.A. Timbes, Inc., 210 S.E.2d 610 (1974)). The Court concludes, even if the alleged defects challenged in this case can be traced to the original construction completed in 2001, that the subsequent 2002 repairs create an issue of fact as to whether Carolina Drywall is estopped from asserting a statute of limitations defense based on its attempt to correct the alleged defects in lieu of suit.

Finally, Carolina Drywall asserts that Centex's third claim for express indemnification fails with respect to the work performed on Building 3. Centex's third cause of action is for indemnification generally, and Centex further specifies that it is entitled to express, contractual, implied and/or equitable indemnification as to each defendant. (Am. Compl. at ¶ 37). Carolina Drywall asserts that the record indicates that any alleged defects with respect to Building 3 stem from the 2002 repairs made by Carolina Drywall, rather than the original construction completed in 2001. Carolina Drywall asserts that the 2002 repairs were not performed pursuant to a written contract, and that no contract containing an indemnification clause applies to the 2002 repairs. However, the record does not conclusively establish whether the alleged defects in workmanship can be traced to the original work performed by Carolina Drywall or to the 2002 repairs. Centex also asserts that both the original construction and the repair work were performed pursuant to a master agreement.

14

Centex points to testimony from a Carolina Drywall principal that "any work performed for Centex came under [the] master agreement." (Deposition of Mike Brownlee at pp. 35:25-36:1). Based on the evidence of record, the Court does not conclude that the claim for express indemnification as it relates to Building 3 should be dismissed. For these reasons, the Court concludes that Carolina Drywall's motion for summary judgment is denied as to Building 3.

The analysis with regard to Building 1 presents a closer question. Again, Carolina Drywall participated in the construction of Building 1 which was completed on April 29, 2002. Shortly after the completion of Building 1, Centex discovered water intrusion damage in the neighboring Building 3. Though Centex engaged in remedial efforts to correct this damage, no remedial efforts were made to address any potential problems with Building 1 at this time. Carolina Drywall argues, as SCSP argued above, that the presence of water damage in Building 3 put Centex on notice of a potential defect in workmanship and threat of future water damage to Building 1. Thus, Carolina Drywall asserts that the statute of limitations with respect to Building 1 should begin to run in the summer of 2002.

However, the record does not conclusively establish that Centex knew or should have known by the exercise of reasonable diligence that a problem existed with Carolina Drywall's work on Building 1 as early as 2002. As discussed in detail above, Centex has proffered evidence to indicate that it took steps to investigate the need to make repairs to Building 1 in 2002 when the damage to Building 3 was discovered. Further, the record does not indicate that there were any visible deficiencies in the scope of Carolina Drywall's work that should have alerted Centex that it had a cause of action against Carolina Drywall prior to 2006. Thus, the Court concludes that an issue of material fact exists as to when Centex was on notice of a potential problem with Carolina Drywall's

work on Building 1. For this reason, Carolina Drywall's motion for summary judgment with regard to the work performed on Building 1 is denied as well.

### c. Ferst Plastering

Ferst Plastering has also moved for summary judgment on the ground that Centex's action is barred by the statute of limitations. As previously stated, Ferst Plastering applied the stucco finish to Building 3, which was completed on June 20, 2001. In the summer of 2002, Centex discovered water intrusion damage to this building, and Ferst Plastering participated in the remedial repairs that were undertaken to correct this damage in 2002. In 2006, Centex discovered additional water damage to this building.

A primary defect attributed to Ferst Plastering involves an allegedly improperly constructed joint in the stucco facade. This joint is located directly on top of a concrete block firewall that runs from the first to the fourth floor of the building. The record indicates that this joint was designed to be filled with caulk to prevent water intrusion. Centex appears to assert that, due to improper installation, the stucco facade is separating from the concrete block firewall at this joint and allowing water to penetrate the stucco facade. In support of its motion for summary judgment, Ferst Plastering asserts that Centex became aware of a separation problem at this joint in 2002 when the remedial repairs were made to the deck-wall areas of Buidling 3, but that Centex took no action to address the separation problem until 2006. In support of this assertion, Ferst Plastering cites the deposition testimony of a Centex field manager on the project.[5]

---

[5] See Deposition of Mark Lewis Hilts at p. 46:11-16:
Q And tell me about that. What did you see, and what did you bring up during the first remediation?
A There was separation between the block firewall and the stucco, and there were cracks in the stucco.

See also Deposition of mark Lewis Hilts at pp. 49:15-52:21:
Q . . . And you said that you observed some separation between the block wall and the stucco - - the firewall and the

16

In response, Centex contends that it first characterized this separation at the stucco joint as a maintenance issue. The Centex construction manager on the project testified that he noticed a problem with the caulking at this firewall joint.[6] However, the construction manager noted by way of affidavit that "[d]uring the Building 3 repairs in 2002, Centex became aware of the property management company's failure to properly maintain the firewall caulk joint on Building 3 and this was brought to the attention of the property manager to address." (Martin Aff. at ¶ 16). Centex further asserts that "[i]t was not until 2006 that Centex learned that the concealed firewall stucco joint assembly was improperly installed by Ferst Plastering." (Martin Aff. at ¶ 16).

The record as it relates to this issue is limited and in conflict. Neither party has introduced sufficient evidence to allow the Court to determine whether Centex was justified in initially

---

    stucco?
A  Yes, sir.
Q  In what locations did you see that separation?
A  Between the block itself and then the stucco application.
Q  Well, right. But I mean like the whole length of the - -
A  The whole length from the first floor through the fourth floor.
Q  Okay. And how big of a gap was that?
A  It could range anywhere from 1/8 of an inch to maybe 1/4 of an inch.
    . . .
Q  Would it have been prudent to do something about that?
A  Yes, sir.
Q  Would it have been prudent at the time it was first discovered to re-caulk it or do something about it?
A  Yes, sir.
Q  Would you say that the failure to do something about it when it was first discovered led to damage later on to the firewall area?
A  Yes, sir.
Q  Okay. Can you think of any reason why Centex, with knowledge of that problem, would not have done anything about it?
A  No, sir.
Q  Can you think of any reason why the Homeowners Association, with knowledge of that problem, did not do anything about it?
A  No, sir.

    [6]See Deposition of Billy Ray Martin at p. 279:3-6:
A  . . . [w]hen I looked at the location of the firewall, there were areas where you could stick your finger in the caulking. It was either separated or, you know, had shrunken quite a bit.

believing that the problem with the firewall joint amounted to a routine maintenance issue. Ferst Plastering asserts that the separation at this joint was indicative of a construction defect rather than a maintenance problem. Centex asserts that it was not aware of an underlying defect in the manner in which this joint was constructed until 2006 when it determined that the "concealed firewall stucco joint assembly" was improperly installed. (Martin Aff. at ¶16). The record does indicate that the design of the building contained a joint in the stucco facade in the area directly above the firewall. The record further indicates that this joint was caulked to prevent water intrusion. However, a determination of whether Centex's recognition of a problem with the caulk in this firewall joint in 2002 should have put Centex on notice that it had a cause of action for an underlying construction defect is a conclusion that is not reasonable for the Court to draw based on the evidence of record. In addition, Centex asserts that the defects in Ferst Plastering's workmanship extend beyond the problem with the firewall joint, and include the improper installation of a horizontal control joint, the improper application of stucco around penetrations such as dryer vents, and the improper concealment of a reverse shingle lap at the deck/column intersections. (Resp. in Opp. at p. 2, Doc. #92). The determination of whether Centex, through the exercise of reasonable diligence, should have discovered these alleged deficiencies prior to 2006 is an issue properly resolved by the finder-of-fact. For this reason, Ferst Plastering's motion for summary judgment is denied.

## CONCLUSION

For the reasons set forth herein, defendant South Carolina State Plastering, LLC's motion for summary judgment, (Doc. #76) is **DENIED**; defendant Ferst Plastering Incorporated's motion for summary judgment, (Doc. #80), is **DENIED**; and defendant Carolina Drywall & Interior Incorporated's motion for summary judgment, (Doc. #85), is **DENIED**.

**IT IS SO ORDERED**.

                                                                            s/ Terry L. Wooten
                                                           United States District Judge

July 27, 2010
Florence, South Carolina